**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WOJCIECH (ADAM) GLAB., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| Fiat Chrysler AUTOMOBILES, US LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | TRIAL BY JURY DEMANDED |
| | ) | |

## **COMPLAINT**

     Plaintiff Wojciech (Adam) Glab ("Glab"), by his undersigned counsel, complains of Fiat

Chrysler Automobiles, US LLC ("Fiat Chrysler"), as follows:

### **PRELIMINARY STATEMENT**

     1.    Plaintiff, Wojciech (Adam) Glab, purchased a 2019 Fiat Chrysler America

Certified Ram 1500 Rebel 4X4 ("the Rebel" or "the Vehicle") for $43,600 plus various charges,

fees, and taxes for a total cash price of $47,411. Plaintiff made a $2,000 down payment and

financed the remaining balance. See Exhibit 1. Glab purchased the Rebel in reliance on Fiat

Chrysler's claim that, as a Fiat Chrysler America (FCA") Certified Preowned ("FCA CPO")

vehicle, the Rebel passed Fiat Chrysler's 125-point inspection and reconditioning process and was

therefore of better quality and condition than similar non-FCA CPO used vehicles by virtue of

having been "certified" by Fiat Chrysler pursuant to Fiat Chrysler's standards. Prior to purchasing

the Rebel, Fiat Chrysler represented to Plaintiff: (a) on its Fiat Chrysler website

(https://www.certifiedpreowned.chrysler.com/index.html) which he visited before purchasing the

Rebel and (b) in brochures he reviewed. Specifically, on its website

(https://www.certifiedpreowned.chrysler.com), Fiat Chrysler represented as follows to Plaintiff to induce the purchase of the Rebel or other FAC US LLC certified pre-owned vehicles:

**GET THE SATISFACTION THAT COMES WITH AN ==FCA US LLC== CERTIFIED PRE-OWNED VEHICLE**.

With a Certified Pre-Owned Vehicle (CPOV), you have far more than just a "used" vehicle. You have confidence, pride and a vehicle that you can trust. You're Certified.

Every Chrysler, Dodge, Jeep®, Fiat and Ram CPOV can be counted on to go the distance. Our CPO vehicles must pass a stringent certification process that guarantees only the finest late model vehicles get certified. Every vehicle that passes is then subjected to a comprehensive 125-point inspection and a thorough reconditioning process using Authentic Mopar® Parts.

For even more peace of mind, add the factory-backed 7-Year/100,000-Mile Powertrain Limited Warranty,1 the 3-Month/3,000-Mile Maximum Care Coverage,2 24-Hour Towing and Roadside Assistance,3 Car Rental Allowance,4 CARFAX® Vehicle History Report™ and an introductory 3-month subscription to SiriusXM® Satellite Radio.5 Plus, we offer something you won't find from any other manufacturer: Certified Warranty Upgrades.6 Imagine that ... a warranty that will cover your CPOV for as long as you own it!

CPOV — it's how to be 100% certified with your vehicle.

2.      In the form certification checklist (created by Fiat Chrysler) and provided to Plaintiff to induce his purchase of the Rebel, Chrysler represented: "This vehicle qualifies as **a Factory-backed** Certified Pre-Owned Vehicle". (Emphasis added). <u>Exhibit 2</u>. The Fiat Chrysler dealer, Sherman Dodge, that sold Plaintiff the Rebel told him they could not locate the filled-out checklist and therefore provided him with the blank form that is attached hereto as <u>Exhibit 2</u>. Sherman Dodge also told Plaintiff that it would provide him with the filled-out checklist in the morning but never did so.

3.      Plaintiff would not have purchased the Rebel had he known that: (a) it was a rebuilt wreck worth substantially less than he paid for it, with defects the FCA CPO extended service contract would not cover; and (b) the certification was not "factory backed" and was not coming from Fiat Chrysler but from a used car dealer only and that Fiat Chrysler would not stand behind

the certification and be responsible for Plaintiff's damages caused by the false certification that misrepresented the condition of the Rebel.

`          4.      With regard to FCA CPO vehicles, Fiat Chrysler claims: "With a Certified Pre-Owned Vehicle (CPOV), you have far more than just a "used" vehicle. You have confidence, pride and a vehicle that you can trust. You're Certified. … CPOV — it's how to be 100% certified with your vehicle" (https://www.certifiedpreowned.chrysler.com/index.html).

5.      In reality, a customer's confidence is misplaced and in fact there is no certification coming from Fiat Chrysler as its marketing, advertising misstate and form certification check list misstate. Fiat Chrysler does not stand behind the FAC CPO at all if a vehicle is a rebuilt wreck that does not actually meet Fiat Chrysler's allegedly exacting standards. All consumers get is a service contract that explicitly excludes coverage for the preexisting accident damage that Fiat Chrysler lures consumers into believing its FAC CPO vehicles are free of.

6.      Fiat Chrysler certified the Rebel despite it suffering from preexisting damage that should have disqualified it as failing at least 29 out of 125 inspection points.

7.      Fiat Chrysler unfairly refuses to honor the certification and make Plaintiff whole by paying for his damages, claiming instead that it is the dealer's certification, not Fiat Chrysler's. Fiat Chrysler takes this position, even though it represented to the public and Plaintiff on its Fiat Chrysler website and in marketing materials for the program reviewed by Plaintiff that the certification is a Fiat Chrysler certification that must meet Fiat Chrysler standards and that if "we", meaning Fiat Chrysler or Ram, found an issue "we" fixed it.

## PARTIES, JURISDICTION, AND VENUE

8.      Wojciech (Adam) Glab is an Illinois resident, with his primary residence in Lake County.  He is deemed to be a citizen of Illinois pursuant to 28 USC § 1332(c)(1).

9. Fiat Chrysler Automobiles, US LLC ("Fiat Chrysler") is a Delaware limited liability company whose sole member is Fiat Chrysler Automobiles N.V., a public limited liability company (*naamloze vennootschap*) incorporated under the laws of the Netherlands with its principal place of business located in London, England. Fiat Chrysler is therefore a citizen of Netherlands and the United Kingdom.

10. This Court has subject matter jurisdiction over this matter pursuant to 28 USC § 1332 because: (a) there is complete diversity of citizenship between the parties, and (b) the amount of controversy exceeds $75,000 exclusive of interest and costs, specifically in excess of $23,780 for the Rebel's diminished value, charges, taxes, interest incurred and aggravation and inconvenience damages, as well as punitive damages of at least three times actual damages, or in excess of $23,780 for total actual and punitive damages of at least $71,340. Given Fiat Chrysler's large net worth and the egregious pattern of intentional misconduct alleged herein that has harmed consumers for many years and which has continued unabated.

11. This court has personal jurisdiction over Fiat Chrysler pursuant to 735 ILCS § 5/2-209(a) and (b) in that:

a. The conduct complained of was directed to and occurred in Illinois because Glab:

i. viewed and relied on Fiat Chrysler's representations in its advertisements for the Fiat Chrysler CPO program and the Rebel in Illinois via websites maintained by Fiat Chrysler directed at citizens of Illinois (among other states);

ii. received fraudulent statements from Fiat Chrysler's agent acting on its behalf in Illinois by misrepresenting that the Rebel conformed to Fiat Chrysler and Fiat Chrysler's certification requirements and that Fiat Chrysler had certified the Rebel; and

b. Fiat Chrysler conducts a substantial amount of business in and purposefully directed at Illinois, in each of the following particulars:

i. Fiat Chrysler advertises and markets its vehicles and parts using websites registered with the Internet Corporation for Assigned Names and Numbers in its own name and directed at citizens of Illinois;

ii. Fiat Chrysler advertises and markets its vehicles in print, television, and radio advertising spots within Illinois and that is directed at citizens of Illinois;

iii. On its own behalf and through its various predecessors in interest, Fiat Chrysler pioneered the American automotive industry practice of utilizing independent franchisees and distributors, and has for more than 100 years maintained an extensive system of franchisees and distributors located within Illinois who act as its agents who are authorized to sell and service its various lines of Fiat Chrysler vehicles and parts, including Fiat Chrysler CPO vehicles;

iv. Fiat Chrysler presently maintains hundreds of contractual relationships with franchisees and distributors located within Illinois through which it sells and services its various lines of Fiat Chrysler vehicles and parts, including Fiat Chrysler CPO vehicles;

v. On information and belief, Fiat Chrysler makes efforts to comply with the Illinois Motor Vehicle Franchise Act, 815 ILCS § 710/1, *et seq.*, with regard to its relationships with Illinois franchisees and distributors and has voluntarily filed suit in Illinois to litigate its rights under those contracts;

vi. Fiat Chrysler maintains numerous contractual relationships with Illinois dealers who are authorized to conduct CPO inspections on its behalf and participate in extending CPO warranties;

vii.     Fiat Chrysler voluntarily maintains suit in Illinois federal and state courts;

viii.    Fiat Chrysler owns and/or leases real property located in Illinois, including property on which it conducts business in its own name, such as distributing parts to its Illinois agents;

ix.     Fiat Chrysler directly employs hundreds of individuals in Illinois; and

x.      Fiat Chrysler is qualified, licensed, and authorized to do business in Illinois and maintains a registered agent for purposes of accepting service of process in Illinois.

12.     Venue is proper in this judicial district pursuant to 28 USC § 1391(b)(1) because Fiat Chrysler Automobiles, US LLC is subject to personal jurisdiction in this judicial district and pursuant to 28 USC § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims arose in this judicial district.

## THE FIAT CHYRYSLER CERTIFIED PRE-OWNED PROGRAM

13.     Fiat Chrysler maintains the "Fiat Chrysler America Certified Pre-Owned" ("FCA CPO") program for Ram and for its other brands Dodge, Jeep, Fiat and Chrysler, through which it and its authorized dealers sell used FCA CPO cars which Fiat Chrysler represents have gone through a strict evaluation to determine whether the cars meet Fiat Chrysler's premium manufacturing standards in order to earn the Fiat Chrysler "certified" title, and therefore qualify for what Fiat Chrysler represents are additional benefits.

14.     Fiat Chrysler represents that to qualify to be FCA CPO, a vehicle must have less than 75,000 miles, be less than 6 model years old, have a clean title, pass the 125-point vehicle inspection and reconditioning process, and have no frame damage.

15.     Fiat Chrysler delegates the pre-sale vehicle inspection and reconditioning process to dealers who are authorized to inspect and recondition vehicles on its behalf. Fiat Chrysler maintains contractual relationships with these dealers and these contracts determine their

6

obligations under the Fiat Chrysler CPO program. However, Fiat Chrysler does not advertise that the certification comes from its dealers and instead advertises and represents that the certification comes from Fiat Chrysler itself (concealing that it has no intention of standing behind the certification if the used car turns out to be a rebuilt wreck).

16.     Fiat Chrysler maintains the right to supervise and direct its agents with respect to the CPO program and creates and supplies all materials provided to purchasing consumers, as well as instructions, checklists, and training materials used by dealers participating in the Fiat Chrysler CPO program.

17.     Sherman Dodge Jeep Chrysler Ram of Skokie ("Sherman"), the dealer from which Plaintiff purchased the vehicle that is the subject of this lawsuit, was at all relevant times an agent of Fiat Chrysler for the purpose of conducting the Fiat Chrysler Certified Pre-Owned inspection and reconditioning process and participating in issuing the Fiat Chrysler Certified Pre-Owned extended warranty. Sherman was acting within the scope of its duties to Fiat Chrysler and under the direct supervision of Fiat Chrysler when it represented that Fiat Chrysler had certified the Rebel. Plaintiff received standard Fiat Chrysler created and approved materials when he purchased the Rebel that it had passed the Fiat Chrysler certification inspection for Fiat Chrysler trucks and was a Fiat Chrysler CPO vehicle. These representations came directly from Chrysler per its written materials such as the form FAC CPO check list.

18.     Prior to the sale of the Rebel to Plaintiff, Fiat Chrysler permitted Sherman to advertise the Rebel for sale as being a Fiat Chrysler CPO vehicle and meeting the strict criteria for such vehicles.

19.     Fiat Chrysler claims that its 125-point inspection is one of the most comprehensive in the industry and that Fiat Chrysler and other Fiat Chrysler brand CPO vehicles are inspected

and reconditioned to strict, factory-set standards by authorized trained technicians to ensure that every vehicle's engine, chassis, and body are in excellent condition. CPO vehicles also must be road-tested, put up on a lift for a complete underbody and frame inspection, and then completely checked for any cosmetic flaw. See https://www.certifiedpreowned.chrysler.com/125-pointinspection.html.

20. Fiat Chrysler represents to customers that Fiat Chrysler CPO vehicles are certified by Fiat Chrysler according to its standards and, by virtue of having passed its 125-point inspection and reconditioning process, are of a superior quality and condition compared with similar non-certified vehicles that did not pass Fiat Chrysler's 125-point vehicle inspection and reconditioning process.

21. Fiat Chrysler claims that if-and only if--a vehicle meets its standards will it receive FCA CPO certification, which Fiat Chrysler represents provides the following benefits:

a. the consumer gets the "confidence, pride and a vehicle that you can trust" knowing that his vehicle passed Fiat Chrysler's 125-point inspection and reconditioning process;

b. Fiat Chrysler provides a new warranty that extends the original one:

7-YEAR/100,000-MILE

*POWERTRAIN LIMITED WARRANTY*

---

- **Runs seven years from date vehicle was originally sold as new or 100,000 miles on odometer (whichever comes first)**
- **Covers repair or replacement of most major powertrain components, including transmission, engine and driveline.**

3-MONTH/3,000-MILE

*MAXIMUM CARE WARRANTY*

---

- **Starts on the date of the CPOV sale, or at the expiration of the remaining 3/36 Basic New Vehicle Warranty**
- **Maximum Care Warranty covers most vehicle components (over 5,000)**

c.      Fiat Chrysler provides roadside assistance;

d.      Fiat Chrysler provides a period of promotional access to SiriusXM satellite radio;

e.      a car rental allowance; and

f.      a CARFAX vehicle history report.

22.      With regard to vehicles with undisclosed preexisting accident damage, these representations are false. Fiat Chrysler refuses to stand behind the affirmative representations it makes about the condition and quality of such a vehicle as having passed its 125-point inspection and reconditioning process. Fiat Chrysler will not make a consumer whole and pay them damages caused when it has misrepresented that a rebuilt wreck or accident--damaged used car or truck has met its strict CPO requirements. This is so even when Fiat Chrysler's agent wrongly certifies a vehicle that has been in an accident and suffered costly, unrepaired or inadequately repaired damage that should have disqualified it from being certified as CPO. Instead, all a purchasing consumer gets is an expensive extended service contract that explicitly does not cover the damage Fiat Chrysler leads consumers to believe its extensive certification and reconditioning process is supposed to guard against.

**PLAINTIFF'S PURCHASE OF A FCA CPO RAM REBEL**

23.      On or about July 4, 2020, Plaintiff searched online to purchase a new vehicle and came across an advertisement from Sherman for a Certified Pre-Owned 2019 Ram 1500 Rebel 4X4 ("Rebel"). At this time, Plaintiff was familiar with Chrysler Fiat's representations regarding its FCA CPO vehicles and had viewed Chrysler's website and brochures regarding those representations.

24. On or about July 6, 2020, Plaintiff went to Sherman of Skokie to inspect the 2019 Rebel for a potential purchase. Sherman presented Plaintiff with a 125-point inspection checklist purporting to represent that the Vehicle was certified by Chrysler, and a CarFax report that indicated the vehicle had purportedly never sustained serious damage as a result of an accident or other cause (the report states it is only as reliable as the information provided to CarFax). In the certified check list created by Chrysler, Chrysler represented to Plaintiff: "This vehicle qualifies as **a Factory-backed** Certified Pre-Owned Vehicle". (Emphasis added). Exhibit 2.

25. In reliance on Fiat Chrysler's certification of the Rebel that the Rebel met the certification standards, Plaintiff purchased it from Sherman Dodge for a total sales price of $47,411.00, including $43,600.00 vehicle selling price, $3,185.00 sales tax, $25.00 for Computer Vehicle Registration, $300.00 Documentation Fee, $301.00 License and Title Fees, with a cash down payment totaling $2,000.00, leaving a balance of $45,411.00—representing the amount financed, through US Bank, at the time of purchase. Exhibit 1, Purchase Invoice.

26. At the time of sale, Plaintiff was provided in his deal bag the following non-exclusive documents: a Purchase Invoice, Retail Installment Contract, Illinois Department of Revenue Sales Tax Transaction Return ST-556, We Care, Waiver of Minimum Warranty on Used Vehicle, Used Vehicle Rider, Spot Delivery Rider, Retail Installment Contract, Agreement to Furnish Insurance Policy, Odometer Disclosure Statement, a Certified Pre-Owned Vehicle Delivery Check Sheet, and an blank Certified Pre-Owned Inspection Checklist. Plaintiff was not provided in his deal bag of documents following purchase: a properly completed Federal Trade Commission ("FTC") Buyer's Guide to clarify Plaintiff's warranties or service contract criteria.

27. On the morning of July 7, 2020, the day following the purchase, Plaintiff carefully looked over the vehicle and discovered, much to his dismay, evidence of uncertifiable

10

characteristics and/or defects that he did not expect to see present on the vehicle which was sold after purporting to have passed a 125-point certification inspection. The noted defects included an improperly functioning bed tail gate, loose & broken bed top cap fascia, mis-aligned body parts, defective paint, and missing or loose lower moldings.

28.     Further evaluation of the Rebel has confirmed that several defects and drivability issues were present which would prohibit the vehicle's certification. There were several exterior body panels with unacceptable paint finishes, varying panel gaps, overspray from repainting, and panel misalignment. Moreover, the underside of the hood had paint thickness, which was inconsistent, causing ripples of orange peel in corrugated areas. Paint edge tape was present in the engine compartment and tape was stuck in the paint of the inside driver's fender. The hood, front doors, fenders, and bumper cover did not join each other or have the proper fitment to adjacent parts. In the interior of the vehicle, the rear seat mechanism cover did not pivot into place to allow the rear seat bottoms to fasten, due to a dent from underneath the right rear floorboard. A test-drive of the Rebel revealed that the vehicle veers to the right, indicating a 10-degree angle, and the 4-wheel drive traction control system, when engaged, steers the vehicle from left to right. These driving abnormalities are an indication of structural damage.

29.     All of the physical, exterior, interior and driving abnormalities are telltale signs of extensive underlying structural or frame damage.

30.     Contrary to Fiat Chrysler's representations to the Plaintiff set forth in its certification and accompanying documentation that the Rebel met Chrysler's certification standards, the vehicle had major, pre-existing exterior damage with potential underlying structural defects caused by, upon information and belief, an undisclosed accident. Moreover, the damage from whatever the cause was never properly repaired prior to the time of sale.

31.     A properly completed 125-point vehicle inspection would have revealed the above-described damage which was easily discoverable at the time of the inspection by thoroughly inspecting the vehicle and would have revealed the Vehicle was unsatisfactory. The Rebel should have failed the following the designated numerical sections of the Certified Pre-Owned Inspection Checklist as described below:

3. No frame damage (Must disassemble to determine extent)
**Ownership Materials**
10.Certified Pre-Owned Consumer Warranty Booklet (absent)
**Mechanical Standards**
**PRE-ROAD TEST**
Underhood checks
11-17. During any of the listed underhood checks, the accident damage or ill-repairs easily observed.
**ROAD TEST**
**Steering performance**
50. Steering wheel center alignment (Off by 5 to 10 varying degrees).
51. Vehicle tracking performance (Rebel drifts rightward beyond road drainage pitch, see video)
**Power train performance**
56. Acceleration performance (Slight rightward front pull prior to traction control correction)
58. Upshifting performance (See 56)
60. Steady throttle performance (See 51, Rebel drifts right)
Vehicle Comfort
67 Interior noise level (Rattle in right rear middle chassis and tire noise from front wheels misalignment.
**Maintenance Standards** (continued)
90. Shocks and struts condition (Mechanical interference on front strut shock)
93. Front Suspension (See above, some disassemble to suspension required to determine damage)
**Appearance Standards**
Exterior Condition
103. Body panels (Very poor condition)
104. Facies (Front left lower facia, with adjacent absent paint under clear coat).
105. Bumpers (Front cover paint does not match adjacent fenders and rear bumper to bed skewed.
109. Truck Bed or bedliner (May be the cause of the rattle)
**Interior Condition**
111. Door panels (Paint overspray adjacent)
115. Carpet/floor mats (Paint overspray dried droplets on adjacent vent driver's rear door jam)

**Detail Standards**
**Exterior detailing**
116. Clean engine compartment (Paint overspray and buffing compound present)
117-119 Touch up, Exterior wash and wax (All exterior defects noted above would be apparent).
120. Wipe down all door jams (Paint overspray and paint droplets would be apparent).
Interior detailing
124. Vacuum and/or shampoo all interior carpets (See 115)

32.     If the Vehicle had been properly inspected, it would not have been certified because it had accident damage, had been improperly repaired, and there was major collision damage, likely causing additional damage to the frame and structure of the Vehicle, making it dangerous to operate. The Vehicle, therefore, did not meet the criteria for passing the 125-point inspection.

33.     Glab reasonably believed Fiat Chrysler's representations that no vehicle that had preexisting unrepaired or inadequately repaired accident damage could pass Fiat Chrysler's CPO inspection without being reconditioned to Fiat Chrysler's standards.

34.     In all, the Rebel should have failed at least 29 out of 125 items on Fiat Chrysler's 125-point CPO inspection checklist as described above in paragraph 30.

35.     As a result, the Rebel was worth about $l1,600 less then Plaintiff paid not including excess, interest and sales taxes paid due to the overcharge making his total damages in excess of $13,780, but not including aggravation, inconvenience and emotional distress damages of at least $10,000.

## <u>COUNT I</u>
**(Illinois Consumer Fraud and Deceptive Business Practices Act — deception)**

36.     Plaintiff repeats and realleges Paragraphs 1-35.

37.     Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), 815 ILCS § 505/2, provides in relevant part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent

that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce and hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

38.     Section 10a of the Consumer Fraud Act, 815 ILCS § 505/10a further provides:

Any person who suffers actual damages as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual damages or any other relief which the court deems proper.

39.     The misconduct alleged occurred in the conduct of trade or commerce within the meaning of Section 1(f) of the Consumer Fraud Act because it occurred in the advertising, offering for sale, and sale for cash or credit of tangible personal property.

40.     Plaintiff is a person within the meaning of Section 1(c) of the Consumer Fraud Act.

41.     At the time of sale, Glab reasonably believed Fiat Chrysler's representations that no CPO vehicle that had preexisting unrepaired or inadequately repaired accident damage could pass Fiat Chrysler's 125-point inspection without being reconditioned to Fiat Chrysler's standards.

42.     At the time of sale, Plaintiff believed that the Rebel had no preexisting unrepaired or inadequately repaired accident damage because it was represented by Fiat Chrysler to have been reconditioned and passed a Fiat Chrysler CPO inspection. Indeed, a CPO inspection would have and likely did flag the substantial unrepaired accident and other damage from which the Rebel suffers.

43.     By representing to Plaintiff, via the internet and through its other standard CPO materials and advertising as to the Rebel, Fiat Chrysler misrepresented that it, not a used car dealer, had certified the vehicle, that the vehicle met the 125-point vehicle inspection, and that Fiat Chrysler would stand by the certification. Fiat Chrysler concealed that the certification was in fact done by a used car dealer, and that Fiat Chrysler would not stand behind or compensate consumers for damages suffered because of a false certification.

44. Fiat Chrysler does not stand by its certification when a vehicle does not meet its criteria for certification and at all relevant times concealed this fact from consumers, including Plaintiff. Fiat Chrysler refused to stand behind its certification when it discovered that Plaintiff's vehicle did not meet the criteria for being certified and would not compensate Plaintiff for his damages. Fiat Chrysler has engaged in this deceptive pattern and practice for many years, misrepresenting that its Fiat Chrysler and other Fiat Chrysler brand certifications are Fiat Chrysler certifications when in fact it takes the position, as part of a uniform company-wide policy, that it is only a Fiat Chrysler used car dealer certification, which Fiat Chrysler will not stand behind. Therefore, Fiat Chrysler does not and will not compensate an injured consumer by paying the damages resulting from a false Fiat Chrysler certification.

45. If Fiat Chrysler had disclosed its intent not to stand behind the Fiat Chrysler CPO certification and that it was not in fact a Fiat Chrysler certification but only a Fiat Chrysler used car dealer certification, Plaintiff would not have purchased the Rebel.

46. By allowing its dealer to advertise and represent the Rebel as an FCA CPO, Fiat Chrysler represented to Plaintiff that the vehicle had undergone and passed the 125-point Fiat Chrysler inspection and at the time of sale, met the stringent standards required to be certified as a Fiat Chrysler CPO vehicle.

47. Fiat Chrysler misrepresented on the CPO website and in standard Fiat Chrysler CPO materials and on a check list form it provided to Sherman to use in connection with the sale, that the Rebel: (a) had been properly inspected by Fiat Chrysler, through its agents, prior to its certification as a Fiat Chrysler CPO vehicle; (b) satisfied Fiat Chrysler's stringent inspection; and (c) had not been in a major accident and had no frame damage. These representations were false: the Rebel had been in at least one serious accident, and it suffered from unrepaired or inadequately

repaired damage that should have been revealed by Fiat Chrysler's inspection. Contrary to Fiat Chrysler's representation on its website and in the Fiat Chrysler materials and representations its agent provided to Plaintiff, the Rebel did not meet the standards for a Fiat Chrysler CPO vehicle.

48.     Despite promising that the Rebel would meet the standards and procedures of its CPO program, Fiat Chrysler permitted an un-certifiable, rebuilt wreck to be sold at a premium under the Fiat Chrysler CPO moniker to Plaintiff. When Plaintiff's vehicle was discovered to have been improperly certified, Fiat Chrysler refused to stand behind the certification and did not offer to compensate Plaintiff for his damages due to Fiat Chrysler's misrepresentations and omissions of material fact. Fiat Chrysler took the position, which is part of an established deceptive and unfair practice going back many years, that the Plaintiff could only look to Fiat Chrysler's used car dealer for relief.

49.     In sum, Fiat Chrysler created a marketing and advertising campaign targeted to Plaintiff and other consumers that allowed it to deceptively advertise the Rebel as a FCA CPO vehicle and not what it really was: a local used car dealership certified pre-owned vehicle that did not meet Fiat Chrysler's stringent certification standards, had been in at least one accident, had many unrepaired or inadequately repaired defects, and was worth far less than the selling price. Fiat Chrysler advertised that it stands behind the certification and that the Fiat Chrysler CPO certification comes from it, even though Fiat Chrysler will not stand behind its certification or compensate a consumer for damages if the CPO vehicle is in fact rebuilt wreck.

50.     These misrepresentations were material to Plaintiff's purchase decision as he would never have purchased the Rebel had he known the truth regarding the misrepresentations and omissions set forth herein, and that the Rebel had been in at least one serious accident and was

worth substantially less than what Plaintiff paid for it and did not meet Fiat Chrysler's CPO standards.

51.     As a direct and proximate result of Fiat Chrysler's material misrepresentations and omissions as alleged above, Plaintiffs suffered damages relating to the Rebel being overpriced by more than $13,780, as well as emotional distress and aggravation and inconvenience damages in an amount to be determined by a jury in excess of $10,000.

52.     Fiat Chrysler's material misrepresentation and omissions were willful and wanton, thus allowing for a punitive damage award of at least 3 times actual damages or well excess of $71,340. Fiat Chrysler generates hundreds of millions of dollars in profits directly and indirectly by employing its fraudulent FCA CPO program both in increased prices for new cars (as the CPO program increases trade-in value for used Fiat Chrysler cars) and in revenues generated by charging its dealers to have a used vehicle certified. This pattern of misconduct, in light of Fiat Chrysler's large net worth and the egregious nature of this knowing misconduct, which has continued unabated for many years, warrants a multi-million-dollar punitive damages verdict in an amount to be determined by the jury. Only a large punitive damages verdict will put a stop to this very wrongful and very profitable and long-standing fraud of misrepresenting that the certification comes from Fiat Chrysler when Fiat Chrysler in fact refused to stand behind it.

WHEREFORE, Plaintiff Wojciech (Adam) Glab prays that this Court enter judgment in his favor and against Fiat Chrysler as follows:

a.     Awarding Plaintiff his actual damages;

b.     Awarding Plaintiff punitive damages;

c.     Awarding Plaintiff his attorneys' fees and costs; and

d.     Awarding Plaintiff such further relief as the Court deems proper and just.

## COUNT II
**(Illinois Consumer Fraud and Deceptive Business Practices Act — unfairness)**

53.     Plaintiff repeats and realleges Paragraphs 1-52.

54.     Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), 815 ILCS § 505/2, provides in relevant part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce and hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

55.     Section 10a of the Consumer Fraud Act, 815 ILCS § 505/10a further provides:

Any person who suffers actual damages as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual damages or any other relief which the court deems proper.

56.     The misconduct alleged occurred in the conduct of trade or commerce within the meaning of Section 1(f) of the Consumer Fraud Act because it occurred in the advertising, offering for sale, and sale for cash or credit of tangible personal property.

57.     Plaintiff is a person within the meaning of Section 1(c) of the Consumer Fraud Act.

58.     Despite representing in its CPO advertising on the websites viewed by Plaintiff that the CPO certification comes from it so that the consumer can trust and have confidence in the purchase, the FAC CPO certification itself provides no value to consumers because it does not protect them from the very types of unrepaired or poorly repaired accident damage that Fiat Chrysler's stringent inspection and reconditioning process is supposed to catch and because the extended service contract Fiat Chrysler does provide alongside the certification explicitly excludes preexisting damage and accident damage. In short, Fiat Chrysler will not make consumers whole and pay them damages for a vehicle that should not have been certified.

59.     Fiat Chrysler's conduct in systematically refusing to stand behind its CPO certifications with respect to vehicles that suffer from unrepaired or inadequately repaired accident damage and refusing to compensate injured consumers for their damages is unfair in that:

a.      it constitutes a long standing and pervasive breach of Illinois' public policy by unjustly enriching Fiat Chrysler to the extent that dealers pay money to Fiat Chrysler in order to certify vehicles under the CPO program according to Fiat Chrysler's standards;

b.      it is immoral, unethical, oppressive and unscrupulous because consumers only learn that a certification purporting to guarantee that a vehicle is free of costly unrepaired or inadequately repaired accident damage is worthless, despite Fiat Chrysler having been paid for the certification, after purchase when Fiat Chrysler refuses to stand behind its certification, as happened to Plaintiff;

c.      it is also immoral, unethical, oppressive, and unscrupulous that Fiat Chrysler confirmed with the used car sales manager of the dealer that sold the Rebel to Plaintiff that it had been involved in an accident, yet refused to honor its certification, leaving Plaintiff no choice but to accept Fiat Chrysler's unlawful behavior or file suit; and

d.      it causes substantial injury to consumers to pay a premium price for a Fiat Chrysler CPO vehicle, believing Fiat Chrysler's claims that such vehicles passed an extensive inspection and reconditioning process, only to receive an extended service contract that does not cover the exact damage Fiat Chrysler's inspection and reconditioning process is intended to weed out.

60.     Fiat Chrysler's unfair conduct in this instance and with regard to similarly situated consumers is willful and wanton, thus allowing for a punitive damage award of at least 3 times actual damages or well in excess of $71,340. Fiat Chrysler generates hundreds of millions of dollars in profits directly and indirectly from its fraudulent CPO program both in increased prices for new cars (as the CPO program increases trade-in value for used Fiat Chrysler cars) and in

revenues generated by charging its dealers to have a used vehicle certified. This pattern of misconduct given Fiat Chrysler's large net worth and the egregious nature of this knowing misconduct, which has continued unabated for many years, warrants a multi-million-dollar punitive damages verdict in an amount to be determined by the jury. Only a large punitive damages verdict will put a stop to this very profitable and long-standing fraud.

WHEREFORE, Plaintiff Wojciech (Adam) Glab prays that this Court enter judgment in his favor and against Fiat Chrysler as follows:

a. Awarding Plaintiff his actual damages;

b. Awarding Plaintiff punitive damages;

c. Awarding Plaintiff his attorneys' fees and costs; and

Awarding Plaintiff such further relief as the Court deems proper and just.

WOJCIECH (ADAM) GLAB

By: /s/Peter S. Lubin
    One of his attorneys

Peter S. Lubin
Patrick Austermuehle
LUBIN AUSTERMUEHLE, P.C.
360 West Butterfield Rd, Suite 325
Elmhurst, IL 60126
630-333-0333
peter@l-a.law
patrick@l-a.law

Terrence Buehler
LAW OFFICES OF TERRENCE BUEHLER
19 South LaSalle, Suite 702
Chicago, IL. 60603
(312) 371-4385
tbuehler@tbuehlerlaw.com

Robert J. Tomei, Jr.
Johnston Tomei Lenczycki & Goldberg LLC
350 N. Milwaukee Avenue, Suite 202
Libertyville, IL 60048
(847) 549-0600
Rob@LawJTLG.com

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to FRCP 38(b), Plaintiff requests a trial by jury.

WOJCIECH (ADAM) GLAB


By: _/s/ Peter S. Lubin_____
     One of his attorneys

# EXHIBIT 1



**SHERMAN** Jeep RAM
On The Corner of Cicero & Howard *of Skokie*

7601 N. Skokie Blvd.
**SKOKIE, ILLINOIS 60077**
Phone (847) 982-9500
Fax (847) 982-9055
www.shermandodge.com

DEAL #:384389
CUST #: 170128

| | |
|---|---|
| SOLD TO **GLAB WOJCIECH** | DATE: **07/06/2020** SALESPERSON **TALEB N HASAN** |
| ADDRESS | CITY **ROUND LAKE** STATE **IL** ZIP **60073** |
| RES. PHONE: BUS PHONE: **(847) 731-7580** CELL PHONE: **(847) 420-5950** E-MAIL: **WGLAB@OUTLOOK.COM** | |

| ☐ NEW | YEAR | MAKE | MODEL | COLOR |
|---|---|---|---|---|
| ☒ USED ☐ DEMO | 2019 | RAM | 1500 REBEL | WHITE |

SERIAL NUMBER: 1C6SRFLT0KN838999 STOCK NO. E5403

All consumer rebate(s) are subject to Illinois state sales tax.

**NOTICE: TO THE NEGOTIATED CASH SALE PRICE OF EACH VEHICLE, NO MORE THAN ___300.00___ MAY BE ADDED FOR DEALER COSTS AND OVERHEAD. THE ONLY OTHER ADDITIONAL CHARGES PERMITTED ARE DEALER ADDED OPTIONS, WARRANTY AND SERVICE CONTRACTS, INSURANCE AND THE ACTUAL COST OF LICENSE AND TITLE REGISTRATION AND TAXES. ADDITIONALLY, DEALERS MAY CHARGE A FEE NOT TO EXCEED $25.00 FOR THE OPTIONAL SERVICE OF ELECTRONICALLY PROCESSING VEHICLE TITLING AND REGISTRATION AND FOR PROVIDING REGISTRATION PLATES OR STICKERS.**

| DEALER INSTALLED OPTIONS OR SERVICES | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| | | |
|---|---|---|
| PRICE OF VEHICLE | 43600 | 00 |
| DEALER INSTALLED OPTIONS | | N/A |
| SELLING PRICE | 43600 | 00 |
| LESS: GROSS TRADE ALLOWANCE | | N/A |
| CASH DIFFERENCE | 43600 | 00 |
| DOCUMENTARY SERVICE FEE | 300 | 00 |
| ELECTRONIC REGISTRATION FEE | 25 | 00 |
| TAXABLE TOTAL | 43925 | 00 |
| SALES TAX | 3185 | 00 |
| COOK COUNTY TAX | | N/A |
| CHICAGO CITY TAX | | N/A |
| FLAT COUNTY TAX | | N/A |
| STATE TITLE AND LICENSE ☒ NEW ☐ TRANSFER | 301 | 00 |
| REBATE(S) | | N/A |
| SERVICE CONTRACT | | N/A |
| GAP COVERAGE | | N/A |
| ESTIMATED BALANCE OWED ON TRADE | | N/A |
| SUB-TOTAL | 47411 | 00 |
| DEPOSIT/DOWN PAYMENT | | N/A |
| CASH DUE OR AMOUNT FINANCED ON DELIVERY | 45411 | 00 |
| BALANCE DUE DEALER | 2000 | 00 |

**DISCLAIMER OF WARRANTY:** Dealer is not a party to any manufacturer warranty that may be applicable and is not a party to any other service contracts or warranties purchased by the customer unless the service contract or warranty states in writing that it is from the Dealer. Unless the warranty or service contract is provided directly by Dealer to customer or unless otherwise required by law, **THIS VEHICLE IS SOLD AS IS - NOT EXPRESSLY WARRANTED OR GUARANTEED** and Dealer hereby disclaims all warranties other expressed or implied, **INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.** Dealer neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of any vehicles.

NO INCIDENTAL AND CONSEQUENTIAL DAMAGES: Whether or not express or implied warranties exist for this vehicle in no event shall purchaser be entitled to receive from Dealer any consequential damages or incidental damages, including without limitation damages to property, damages for loss of use, loss of profits or mental anguish and aggravation arising from liability based upon breach of warranty, contract, tort strict liability or any other statutory or common law theory of liability.

LIMITED DURATION OF IMPLIED WARRANTIES: To the extent that implied warranties can not be disclaimed because this vehicle has been sold with a written warranty or service contract, the maximum duration of any such implied warranties is limited to the duration of the written warranty or service contract.

I UNDERSTAND THAT I AM RESPONSIBLE TO PROVIDE *SHERMAN DODGE* WITH A LIEN-FREE TITLE FOR MY TRADE IN. I WILL PROVIDE THIS TITLE TO *SHERMAN DODGE* WITHIN 10 DAYS FROM TODAY. SINCE I AM UNABLE TO PRODUCE THE TITLE UPON DELIVERY, I UNDERSTAND THERE IS A DUPLICATE TITLE FEE OF $95.00

**FTC WINDOW STICKER.** THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM (BUYER'S GUIDE) OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT FOR SALE.

**THANK YOU FOR YOUR BUSINESS**

TRADE-IN DESCRIPTION
(See trade-in terms and conditions on back)

| YEAR | MAKE | | MODEL | |
|---|---|---|---|---|
| BODY STYLE | | COLOR | | LICENSE NO. |
| MILEAGE | ENGINE | STOCK NO. | | A.C.V. |

V.I.N.

TITLE HELD BY:

ADDRESS

CITY STATE ZIP

ACCOUNT NO.

IN THE EVENT OF A TIME SALE, DEALER SHALL NOT BE OBLIGATED TO SELL UNTIL AND UNLESS A FINANCE SOURCE APPROVES THIS ORDER AND AGREES TO PURCHASE A RETAIL INSTALLMENT CONTRACT BETWEEN CUSTOMER AND DEALER BASED ON THIS ORDER. This transaction is non-cancelable after the signing of this agreement except as provided herein. If you fail to comply with your obligations under this contract, you will be liable for the REASONABLE ATTORNEY'S FEES AND COSTS incurred by Dealer in the enforcement of the contract.

I acknowledge that Dealer and its agents and representatives have made no representations, agreements or promises, concerning the contract, financing or the vehicle being purchased hereunder, that do not appear in writing. By signing below Dealer certifies that all identifying numbers contained in this bill of sale agree with those on the certificate of title.

I certify that I am 18 years of age or older. I acknowledge that I have read the terms of this contract (front and back) and that I have been offered a copy of this contract.

PURCHASER SIGNS X _____ DATE __07/06/2020__

DATE __07/06/2020__

MANAGER'S APPROVAL (Must Be Accepted By An Authorized Representative of the Dealer)

CO-PURCHASER SIGNS X _____ DATE _____

NO PUBLIC LIABILITY INSURANCE ISSUED WITH THIS TRANSACTION

# EXHIBIT 2

# Certified Pre-owned
CHRYSLER · DODGE · JEEP · RAM

## CERTIFIED PRE-OWNED VEHICLE INSPECTION CHECKLIST

This inspection checklist must be completed with all items checked, signed by responsible persons, as indicated and retained along with repair orders in the vehicle's history file. Failure to do so will void the vehicle's Certification.

Dealership Name _____
Year Make and Model _____
Color _____
VIN _____
Date Inspected _____

Original Service Date _____
R.O. Number(s) _____
Stock Number _____
Mileage _____

Tony



### Qualification Standards

| | Meets FCA Standards | Not Applicable |
|---|---|---|
| Under 75,000 miles | ☐ | |
| Five model years or newer | ☐ | ☐ |
| No frame damage | ☐ | ☐ |
| Clean title | ☐ | ☐ |
| Aftermarket accessories do not compromise safety, emissions or operation of vehicle | ☐ | ☐ |

### Documentation Materials

| | | |
|---|---|---|
| Warranty Manual | ☐ | |
| Owner's Manual | ☐ | |
| Certificate of title | ☐ | |
| CARFAX report | ☐ | ☐ |
| Certified Pre-Owned Consumer Warranty Booklet | ☐ | ☐ |

### Appearance Standards

**Underhood Checks**

| | | |
|---|---|---|
| Any fluid or remote keyless entry | ☐ | |

**PRE-ROAD TEST**

| | | |
|---|---|---|
| 1. Hood release | ☐ | ☐ |
| 2. Brake fluid | ☐ | ☐ |
| 3. Power steering fluid filled | ☐ | ☐ |
| 4. Wiper/washer fluid filled | ☐ | ☐ |
| 5. Battery operation/load test | ☐ | ☐ |
| 6. Charging system operation | ☐ | ☐ |
| 7. Throttle linkage operation | ☐ | ☐ |

**Operational checks**

| | | |
|---|---|---|
| Recreational checks | | |

**ROAD TEST**

| | Meets FCA Standards | Not Applicable |
|---|---|---|
| 46. Ease of starting | ☐ | ☐ |
| 47. Cruise control operation | ☐ | ☐ |
| 48. Gear selector operation | ☐ | ☐ |

**Steering performance**

| | | |
|---|---|---|
| 49. Power steering performance | ☐ | ☐ |
| 50. Steering wheel center alignment | ☐ | ☐ |
| 51. Vehicle tracking performance | ☐ | ☐ |

**Equipment operation**

| | | |
|---|---|---|
| 52. Overdrive | ☐ | ☐ |
| 53. Overdrive | ☐ | ☐ |
| 54. Instrument panel gauges | ☐ | ☐ |
| 55. Sound and/or entertainment system | ☐ | ☐ |

**Powertrain performance**

| | | |
|---|---|---|
| 56. Acceleration performance | ☐ | ☐ |
| 57. Clutch operation (manual transmissions) | ☐ | ☐ |
| 58. Upshifting performance | ☐ | ☐ |
| 59. Downshifting performance | ☐ | ☐ |
| 60. Steady rhythm/idle performance | ☐ | ☐ |
| 61. Idle/deceleration performance | ☐ | ☐ |

**Braking performance**

| | | |
|---|---|---|
| 62. Brake booster performance | ☐ | ☐ |
| 63. Vehicle tracking | ☐ | ☐ |
| 64. Stopping performance | ☐ | ☐ |
| 65. Overall stopping performance | ☐ | ☐ |

**Vehicle comfort**

| | | |
|---|---|---|
| 66. Interior noise level | ☐ | ☐ |

**POST-ROAD TEST**

| | | |
|---|---|---|
| 67. Fluid leaks – visible inspection | ☐ | ☐ |
| 68. Exhaust system | ☐ | ☐ |
| 69. All fluid levels/underhood | ☐ | ☐ |
| 70. Hot restart performance | ☐ | ☐ |

### Maintenance Standards

**Perform the following fluid inspection and/or changes:**

| | | |
|---|---|---|
| 71. Change engine oil, oil filter and use Mopar, Pentzoil | ☐ | ☐ |
| 72. Inspect air filter | ☐ | ☐ |
| 73. Automatic transmission fluid and filter | ☐ | ☐ |
| 74. Manual transmission fluid | ☐ | ☐ |
| 75. Transfer case fluid (4x4 only) | ☐ | ☐ |
| 76. Rear axle differential fluid (4x4/RWD/AWD) | ☐ | ☐ |
| 77. Engine coolant level and test | ☐ | ☐ |
| 78. Front brake pads 50% or more of lining remaining | ☐ | ☐ |
| 79. Rear brake pads 50% or more | ☐ | ☐ |
| 80. Front and rear brake component condition | ☐ | ☐ |
| 81. Tires have 50% or more of tread remaining | ☐ | ☐ |
| 82. Perform outstanding vehicle campaigns | ☐ | ☐ |

### Maintenance Standards (continued)

| | Meets FCA Standards | Not Applicable |
|---|---|---|
| 83. Identify new Mopar accessories or additional information box | | |
| 84. Consult with actual dealer for recommended factory load capacity | ☐ | ☐ |
| 85. Wheels match are correct | ☐ | ☐ |
| 86. Tread depth is 4/32" remaining | ☐ | ☐ |
| 87. Tire sidewall condition | ☐ | ☐ |
| 88. Tire pressures are set to specification | ☐ | ☐ |
| 89. Brake line condition | ☐ | ☐ |
| 90. Shocks and struts condition | ☐ | ☐ |
| 91. CV joint boot condition | ☐ | ☐ |
| 92. Exhaust system | ☐ | ☐ |
| 93. Rear suspension | ☐ | ☐ |
| 94. Front suspension | ☐ | ☐ |
| 95. Steering components | ☐ | ☐ |
| 96. Where belts inspect to specifications | ☐ | ☐ |
| 97. Tire changing equipment (including jack), if applicable | ☐ | ☐ |
| 98. Drive belts are tight and not damaged | ☐ | ☐ |
| 99. Engine hoses | ☐ | ☐ |
| 100. Emission system hoses | ☐ | ☐ |
| 101. Fluid leaks | ☐ | ☐ |
| 102. Module scan/self check | ☐ | ☐ |

### Appearance Standards

**Exterior condition**

| | | |
|---|---|---|
| 103. Body panels | ☐ | ☐ |
| 104. Fascias | ☐ | ☐ |
| 105. Bumps | ☐ | ☐ |
| 106. Double windshields/trim pieces in place | ☐ | ☐ |
| 107. Glass/lamp covers | ☐ | ☐ |
| 108. Wheel/wheel covers | ☐ | ☐ |
| 109. Truck bed/festliner | ☐ | ☐ |

**Interior condition**

| | | |
|---|---|---|
| 110. Instrument panel | ☐ | ☐ |
| 111. Seat panels | ☐ | ☐ |
| 112. Seating | ☐ | ☐ |
| 113. Headliner/package tray | ☐ | ☐ |
| 114. Luggage compartment | ☐ | ☐ |
| 115. Carpet/floor mats | ☐ | ☐ |

**Exterior detailing**

| | | |
|---|---|---|
| 116. Clean engine compartment | ☐ | ☐ |
| 117. Touch-up/recondition | ☐ | ☐ |
| 118. metal surface scratches | ☐ | ☐ |
| 119. Remove tar and road oil | ☐ | ☐ |
| 120. Exterior wash and wax | ☐ | ☐ |
| 121. Wipe down all door jambs | ☐ | ☐ |

**Interior detailing**

| | | |
|---|---|---|
| 122. Clean ashtray/cigarette lighter | ☐ | ☐ |
| 123. Clean vinyl, plastic and leather surfaces | ☐ | ☐ |
| 124. Vacuum and/or shampoo all interior carpeting | ☐ | ☐ |
| 125. Clean glass surfaces | ☐ | ☐ |

**Detail Standards (continued)**

**Authorized Signature**

My dealership has inspected all of the above items. The vehicle qualifies as a factory-authorized Certified Pre-Owned vehicle. Except where noted, all standards below have been met.

Authorized Signature _____

Title _____

Date _____

**Customer Signature**

Signature _____

Date _____

**Additional Information**

_____

Chrysler, Dodge, Jeep and Mopar are registered trademarks of FCA US, LLC. CARFAX is a registered trademark of CARFAX Inc.